IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRIAN MᶜDANIEL,

    *Plaintiff*,

    v.

OFFICER ARNOLD and
OFFICER C. IZQUIERDO,

    *Defendants*.

Civil Action No. ELH-10-189

**MEMORANDUM OPINION**

Brian McDaniel, plaintiff, filed suit against the State of Maryland, the Maryland Department of Transportation ("MDOT"), the Maryland Transportation Authority ("MdTA"), and two of its officers, Ronald Arnold and Christopher Izquierdo (collectively, the "Officers"), alleging a variety of federal and Maryland constitutional and statutory claims and common law torts arising from a traffic stop conducted on November 8, 2006, in Baltimore, Maryland.[1]  In the course of the stop, the Officers[2] ascertained that Mr. McDaniel had a Pennsylvania permit to

---

[1]  Mr. McDaniel filed suit in the Circuit Court for Baltimore City, Maryland.  The defendants removed the case to federal court on the basis of federal question jurisdiction and supplemental jurisdiction as to the state law claims.  *See* 28 U.S.C. §§ 1331, 1367, 1441; *see also* Notice of Removal (ECF 1).  In the Complaint (ECF 2) and the Amended Complaint (ECF 19), plaintiff alleged that the traffic stop occurred on November 7, 2006.  *See* Complaint ¶ 17; Amended Complaint ¶ 13.  However, it appears to be undisputed that the stop actually took place on November 8, 2006.

[2]  Officer Arnold continues to be employed by the MdTA Police as a Correction Officer.  *See* Deposition of Ronald Arnold at 5 ("Arnold Dep.") (ECF 45-3).  Officer Izquierdo is now a Detective with the Baltimore City Police.  *See* Deposition of Christopher Izquierdo at 5-10 ("Izquierdo Dep.") (ECF 45-4).  Nevertheless, I will refer to the Officers as Officer Arnold and Officer Izquierdo, consistent with their positions at the time of the incident in question.

Plaintiff originally sued Officer Izquierdo under the pseudonym "Officer John Doe."  In the caption of plaintiff's Amended Complaint, in which Officer Izquierdo was first sued by name, plaintiff misspelled Officer Izquierdo's surname as "Izquiedro," and the error has carried over to the captioning of the case on the docket.  In the Order that accompanies this Memorandum Opinion, the Clerk is directed to correct the spelling.

carry a handgun, learned from Mr. McDaniel that he was transporting a handgun in the trunk of his car, searched the vehicle, recovered the handgun from the trunk, and arrested Mr. McDaniel for the Maryland offense of wearing, carrying, or knowingly transporting a handgun in a vehicle. *See* Md. Code (2012 Repl. Vol.), § 4-203(a)(1)(ii) of the Criminal Law Article ("C.L.").[3]  The charge was subsequently *nol prossed*.

On November 6, 2009, Mr. McDaniel filed a twelve-count Complaint (ECF 2) against the Officers, the State, the MdTA, and the MDOT.  In a Memorandum Opinion and Order dated August 18, 2010 (ECF 17 & ECF 18), Judge Richard D. Bennett granted in part and denied in part defendants' Motion to Dismiss and Supplemental Motion to Dismiss, resulting in the dismissal of all claims against the State, the MdTA, and the MDOT, and the dismissal of several claims against the Officers.[4]

Thereafter, plaintiff filed an Amended Complaint (ECF 19) against the Officers, reasserting the four counts that remain at issue: Count I asserts a cause of action under 42 U.S.C. § 1983 based on an allegedly unreasonable search and seizure, in violation of the Fourth Amendment to the United States Constitution and a federal statute, 18 U.S.C. § 926A, which is a provision of the Firearm Owners Protection Act; Count II alleges violations of Articles 24 and 26 of the Maryland Declaration of Rights; Count III asserts the tort of false imprisonment; and "Count X" alleges a civil conspiracy.

Following the conclusion of discovery, the Officers filed a Motion for Summary Judgment (ECF 44), which has been fully briefed.[5]  A hearing is not necessary to resolve it.  *See*

---

[3] I have cited the version of C.L. § 4-203 currently in effect because, since the date of the traffic stop, the statute has not been amended in any way relevant to the issues in this case.

[4] The case was reassigned to me on January 14, 2011.

[5] In addition to the Motion for Summary Judgment and its supporting memorandum (ECF 44-1) (collectively, "Motion"), I have considered plaintiff's Opposition (ECF 45), the

Local Rule 105.6.  I will deny the Motion, for the reasons that follow.

## Factual Background

This Factual Background is drawn from the exhibits submitted by the parties, which include the depositions of Mr. McDaniel, Officer Arnold, and Officer Izquierdo;[6] a DVD video of the traffic stop, recorded by the dashboard camera mounted in the Officers' police vehicle, *see* Video, Ex.2 to Motion;[7] a "Criminal Investigation Report," "Supplemental/Continuation Report," and "Statement of Charges" (including a "Statement of Probable Cause"), prepared by Officer Arnold, *see* Ex.1 to Motion (ECF 44-2 at 1-5); and a copy of the unofficial public docket for the short-lived criminal proceeding against Mr. McDaniel, printed from the Maryland

---

Officers' Reply (ECF 46), and the parties' exhibits.

[6] The transcripts of Officer Arnold's deposition and Officer Izquierdo's deposition are appended to plaintiff's Opposition as Exhibits B and C, respectively.  Both sides have submitted portions of the transcript of plaintiff's deposition.  *See* Deposition of Brian McDaniel ("McDaniel Dep."), Ex.3 to Motion (ECF 44-2 at 9-17) and Ex.A to Opp. (ECF 45-2).  Rather than refer to the pagination of particular exhibits, I cite to the pagination of the transcripts.

[7] The Video is overlaid with the date and the running time (in the format "hours:minutes:seconds," with hours represented in a 24-hour format, *i.e.*, "military time").  I cite to the Video by reference to the approximate time displayed.  The Video begins at 14:22:40 (approximately 2:22 p.m.) on "11-08-06."

Many of the relevant events were recorded in the Video.  As Judge Diana Motz explained in *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011), "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment.'"  *Id.* at 276 (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  However, this principle does not license a court to "reject a plaintiff's account on summary judgment" if the "documentary evidence, such as a video," merely "offers *some* support for a governmental officer's version of events."  *Witt*, 633 F.3d at 276 (emphasis in original).

Moreover, not all of the events relevant here were recorded in the Video; the picture quality of the Video is lacking in some respects; and, in particular, the audio portion of the Video is at times difficult or impossible to understand due to the placement of the microphones, noise from passing traffic on Interstate 95, and other technical limitations.  Accordingly, to the extent that the Video clearly depicts the events at issue, the Video will prevail over contrary evidence submitted by either side.  However, to the extent that the Video is unclear or ambiguous, I must adopt plaintiff's version of events for purposes of the Motion.

Judiciary's "Case Search" website (http://casesearch.courts.state.md.us/), *see* Ex.4 to Motion (ECF 44-2 at 18-20).  Unless otherwise noted, the facts presented are the version of events most favorable to Mr. McDaniel.  *See T-Mobile Northeast LLC v. City Council of City of Newport News*, 674 F.3d 380, 385 (4th Cir. 2012) (stating that, when considering a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party).

Mr. McDaniel was born in 1976, and was thirty years of age at the time of the events at issue.  *See* McDaniel Dep. at 6.  He is African-American.  *See* Amended Complaint ¶ 10.

On the afternoon of November 8, 2006, Mr. McDaniel was driving his Dodge Intrepid southbound on Interstate 95.  McDaniel Dep. at 17, 23.  No passengers were in the vehicle. Plaintiff was traveling from his parents' home in Philadelphia, Pennsylvania to his apartment in Cockeysville, Maryland.  *See id.* at 6-7, 18.  Plaintiff had quit his job in Maryland in September 2006, and was residing "back and forth" at both addresses.  *Id.* at 19; *see also id.* at 12-13, 17-20. Mr. McDaniel's parents own a second home in Ormond Beach, Florida, and plaintiff's vehicle was registered at their Florida address, with Florida license plates.  *Id.* at 20-22.

Mr. McDaniel was carrying his Glock 19 handgun in a plastic shopping bag in the trunk of the Intrepid.  *See id.* at 39-42.  A magazine of ammunition was seated in the weapon, but the handgun did not have a round in its chamber.  *Id.* at 43; *see also* Izquierdo Dep. at 22.  In addition, there was another magazine of ammunition in the shopping bag with the handgun. McDaniel Dep. at 43; *see also* Statement of Probable Cause.

Plaintiff had purchased the handgun at a gun shop in Philadelphia, and he had a Pennsylvania permit to carry the weapon.  McDaniel Dep. at 40.[8]  He was transporting the

---

[8]  The Pennsylvania Uniform Firearms Act, 18 Pa. Cons. Stat. Ann. §§ 6101 *et seq.*, provides for statewide licensure to "carry[ ] a firearm concealed on or about one's person or in a vehicle" upon application, *id.* § 6109(a), provided that the applicant does not meet certain disqualifying criteria.  *See id.* § 6109(e)(1).  In other words, Pennsylvania is a so-called "shall

weapon from Philadelphia so that he "could have it in [his] apartment in Maryland." *Id.* at 42. Although McDaniel did not have a Maryland license to carry or transport a handgun, Maryland does not require a person to obtain a license in order to possess a handgun at home. *See Williams v. State*, 417 Md. 479, 486, 10 A.3d 1167, 1171-72 (stating that Maryland's regulatory scheme for handgun possession "expressly permits wearing, carrying, or transporting a handgun in the home," without the requirement of licensure), *cert. denied*, 132 S. Ct. 93 (2011); *accord Wieland v. State*, 101 Md. App. 1, 29, 643 A.2d 446, 459-60 (1994) (same, interpreting earlier codification).[9]

Mr. McDaniel intended to take I-95 South through the Fort McHenry Tunnel en route to Cockeysville. As shown in the Video, I-95 South is a five-lane highway shortly before it diverges. When the highway splits, the left two lanes become I-895, which continues through the Baltimore Harbor Tunnel, while the right three lanes continue as I-95, through the Fort

---

issue" state. *See, e.g.*, Nicole Hartley, *Business Owner Liability and Concealed Weapons Legislation: A Call for Legislative Guidance for Pennsylvania Business Owners*, 108 PENN ST. L. REV. 637, 648 (Fall 2003) ("As a 'shall issue' state, Pennsylvania issues concealed weapons permits to applicants without granting local officials discretion to deny a permit if an applicant fails to demonstrate a need for a concealed weapon.") (footnotes omitted).

[9] Unlike Pennsylvania, Maryland is not a "shall issue" state. Maryland's licensure law, codified in Md. Code (2011 Repl. Vol.), §§ 5-301 *et seq.* of the Public Safety Article ("P.S."), requires an applicant to demonstrate that he or she does not meet disqualifying criteria, and also to show "good and substantial reason to wear, carry, or transport a handgun." P.S. § 5-306(a)(5)(ii). However, in *Woollard v. Sheridan*, ___ F. Supp. 2d ___, 2012 WL 695674, 2012 U.S. Dist LEXIS 28498 (D. Md. Mar. 2, 2012), Judge Benson E. Legg held that P.S. § 5-306(a)(5)(ii) is insufficiently tailored to Maryland's interest in public safety and crime prevention, and thus does not pass constitutional muster under the Second Amendment and the Supreme Court's landmark decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010). Pending appeal, the Fourth Circuit subsequently stayed the injunction enjoining enforcement of the "good and substantial reason" provision. *See Woollard v. Sheridan*, No. 12-1437 (4th Cir.) (docket). If the District Court's injunction is affirmed, it will effectively convert Maryland to a "shall issue" state. *See, e.g.*, Tricia Bishop, *Access Widens to Maryland Gun-Carry Permits*, BALT. SUN, July 25, 2012, at 1A (stating that *Woollard* decision "effectively shifted Maryland to a 'shall issue' policy, like a majority of states, which automatically issue gun-carry permits once basic safety conditions are met").

McHenry Tunnel.   Both the Harbor Tunnel and the Fort McHenry Tunnel, along with Maryland's other "major toll-producing bridges, tunnels, and thoroughfares," are operated by the MdTA. *MdTA Police Lodge #34 of Fraternal Order of Police v. MdTA*, 195 Md. App. 124, 135, 5 A.3d 1174, 1180 (2010), *rev'd in part on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also* Md. Code (2008 Repl. Vol., 2011 Supp.), §§ 4-101(h)(1), 4-204(a) of the Transportation Article ("Transp.") (granting operational authority over the Harbor Tunnel and Fort McHenry Tunnel to MdTA).   The MdTA's police force has police power on all MdTA property and, by executive order, on "'all publicly owned, commercial, and/or common carrier transportation assets throughout the State.'"   *MdTA Police Lodge*, 195 Md. App. at 142, 5 A.3d at 1184 (quoting executive order).

As Mr. McDaniel approached the point where southbound I-95 diverges, he was driving in the far left lane; in order to continue on I-95, he had to merge to the right.   *See* McDaniel Dep. at 29-30.   According to Mr. McDaniel, as he drove southbound on I-95 in the left lane, before the point where the highway diverges, he noticed, "way far ahead" of him, a police vehicle sitting in the median between southbound and northbound I-95, in a crossover formed by a break in the jersey barriers separating the two sides of the highway.   *Id.* at 26-28.   Mr. McDaniel estimated that he noticed the Officers' car when he was approximately a quarter-mile to a half-mile away from it, and slowed down as he approached, because he didn't "want to take any chances."   *Id.* at 27-28.   The police car was facing the southbound lanes, and its occupants (Officer Arnold and Officer Izquierdo) appeared to be "watching cars."   *Id.* at 27.

Officer Izquierdo, who was driving the police vehicle, had recently joined the MdTA Police, and Officer Arnold was training him in the "tasks and duties" of "highway patrol."   Arnold Dep. at 11-12; *see also* Izquierdo Dep. at 10-11, 42.   Although Officer Izquierdo was

new to the MdTA Police, he was an experienced police officer.  He began his police career in 1995 or 1996 with the Baltimore City Police, and also worked for a time as an officer in Colorado.  *See* Izquierdo Dep. at 7-9.  However, in his previous police positions, Officer Izquierdo had not gained much experience with highway traffic enforcement.  *Id.* at 9-10.

Mr. McDaniel estimated that, at the time he passed the police car, he was traveling "about fifty to fifty-five" miles per hour in the far left lane.  *Id.* at 29.  As Mr. McDaniel passed the police car, the Officers "stared right at" him.  *Id.* at 31.  Soon after he passed the police vehicle, Mr. McDaniel changed lanes to the right, beginning to merge across the highway in order to stay on I-95.  *Id.* at 29-30.  However, as he did so, he noticed that the police car had pulled behind him, and he "could make a guess" that the Officers were about to stop him.  *Id.* at 30-31.[10]

Shortly thereafter, the video recorder in the Officers' vehicle was activated; it begins at 14:22:40 (*i.e.*, 2:22 p.m.).[11]  At this point, Mr. McDaniel's vehicle has merged one more lane to the right and is travelling in the middle lane (the third lane from the left).  Another car, light gray

———————————————————

[10] As noted, for purposes of the Motion, I must adopt Mr. McDaniel's version of the facts.  However, I observe that the Officers told a somewhat different version of events at their depositions.

According to Officer Arnold, he and Officer Izquierdo did not notice Mr. McDaniel's vehicle until after they had already made a U-turn onto I-95 South from I-95 North at what Officer Arnold called the "6033 crossover," which he testified is the northern boundary of the MdTA Police's "primary jurisdiction" on the stretch of I-95 near the tunnels.  Arnold Dep. at 77. According to Officer Arnold, the Officers were not stopped on the side of the road at any time; rather, they were simply patrolling back and forth on northbound and southbound I-95, looking for "vehicle violations," such as improper "[t]ags, lights, windshield, tint, [or] speed."  *Id.* at 13-16.  Officer Arnold testified that, after the Officers were already traveling southbound, Officer Izquierdo observed Mr. McDaniel's car travelling at what Izquierdo believed was a speed in excess of the applicable limit.  *Id.* at 17.

Officer Izquierdo recalled that he observed Mr. McDaniel's vehicle "traveling at a high rate of speed."  *See* Izquierdo Dep. at 13.  But, he could not recall the precise circumstances in which he noticed the vehicle before the events captured by the Video.  *Id.* at 11-13.

[11] In referring to events that the Video depicts, I use the present tense, describing the events as they appear to occur to a viewer of the Video.

in color, is one lane to the right of Mr. McDaniel's vehicle (in the fourth lane from the left), traveling roughly parallel to Mr. McDaniel.  The police vehicle is in the second lane from the left (*i.e.*, one lane to the left of Mr. McDaniel's vehicle), several car lengths behind the other two vehicles.  In the video, it is not possible to see the drivers, nor is there any audio at this point.

The Video shows the gray car passing Mr. McDaniel's car on the right.  Concurrently, the police car merges to the right into the third lane, directly behind Mr. McDaniel's vehicle.  Signs above the road denote the impending division of the highway into I-895 on the left and I-95 on the right.

At 14:22:55 in the Video, Mr. McDaniel signals a right turn, and merges to the right, into the fourth lane from the left, behind the gray car that just passed him.  He is several car lengths behind the gray car, approximately the same distance as the police car is from him.  The police car again merges right, remaining behind Mr. McDaniel's car.  All three vehicles are apparently maintaining their speed.

In their depositions, Officer Arnold and Officer Izquierdo testified that they were not using radar or a "lidar" device to determine vehicle speed and, indeed, neither officer could recall whether the police vehicle was even equipped with such a device.  *See* Arnold Dep. at 14; Izquierdo Dep. at 13.  According to the Officers, they gauged the speed of Mr. McDaniel's vehicle by "pacing," *i.e.*, driving "behind [McDaniel's vehicle] to set a pace."  Izquierdo Dep. at 13; *see also* Arnold Dep. at 16-17.  At his deposition, Officer Izquierdo did not recall the exact speed at which he paced Mr. McDaniel, but he thought that it was a sufficient "speed to be able to initialize a stop."  Izquierdo Dep. at 13.  Officer Arnold testified that the Officers would not have performed a stop based simply on "eyeball[ing]" the speed.  Arnold Dep. at 17.

- 8 -

At 14:23:18 in the Video, the brake lights on Mr. McDaniel's vehicle are activated for approximately two seconds.  Officer Arnold claimed that Mr. McDaniel "had to slam on his brakes to avoid hitting the vehicle in front of him."  Arnold Dep. at 19.  Officer Izquierdo testified that he remembered Officer Arnold stating that Mr. McDaniel was following the car ahead of him too closely, but Izquierdo did not recall observing that violation himself. According to Officer Izquierdo, he was concentrating on pacing Mr. McDaniel's vehicle. Izquierdo Dep. at 14.

At his deposition, Mr. McDaniel did not recall his application of the brakes.  He also testified that there was no traffic except for the car in front of him, which was "way down the line."  McDaniel Dep. at 34-35.  It is not possible to see the gray car (or any other traffic) ahead of Mr. McDaniel's vehicle at this point in the Video; as noted, the gray car was several car lengths ahead of Mr. McDaniel's vehicle seconds earlier, when plaintiff merged behind the gray car, and both cars appeared to be maintaining approximately the same speed at that time.

At this point in the Video, the division of the road into I-895 and I-95 is imminent: there is a solid white dividing line between the two left lanes and the three right lanes, and the right lanes turn off to the right shortly ahead of Mr. McDaniel's vehicle.  Approximately even with the point where the highway diverges, there is a gap in the jersey barriers in the median, and what appears to be another police car parked there, facing southbound traffic on I-95.

At 14:23:23 in the Video, the letter "L" is overlaid on the video.  Presumably, this indicates the activation of the police car's emergency lights, because Officer Arnold testified that Officer Izquierdo activated the police cruiser's emergency lights, *see* Arnold Dep. at 20, and in the Video, Mr. McDaniel immediately signals a right turn, brakes, and merges into the far right lane.  The audio recorder is activated two seconds later, at 14:23:26, and the siren on the police

vehicle can be heard momentarily.

According to the Video, the three southbound lanes of I-95 have now separated from the two lanes of I-895, and the road is turning, and so the gray car can now be seen ahead of Mr. McDaniel's car. Both vehicles are now in the far right lane; the gray car apparently merged into the right lane at approximately the same time as Mr. McDaniel (otherwise, it would have become visible earlier in the Video). The right hand shoulder along the turn is blocked by orange and white traffic cylinders, such that there is no place to pull over. At 14:23:51, the vehicles pass a speed limit sign (the first one that has been shown in the Video), indicating a speed limit of 55 miles per hour.

At 14:23:59, the lanes of the highway straighten out and shortly thereafter, an unobstructed right shoulder becomes available. Mr. McDaniel immediately signals a right turn, merges onto the shoulder, and comes to a stop; the police vehicle stops behind him at 14:24:26 in the Video. Some largely unintelligible radio chatter is heard, and Officer Izquierdo then advises the dispatcher of their location and the license plate number of Mr. McDaniel's vehicle. At 14:25:41, the Officers exit their car and walk toward Mr. McDaniel's car. As they do so, Officer Arnold instructs Officer Izquierdo: "Tell him he was doing 70, maybe following too close, whatever you want to tell him."

Officer Izquierdo approaches the driver's window while Officer Arnold initially approaches the passenger side. Officer Izquierdo identifies himself, informs Mr. McDaniel that the stop is being recorded, and asks for McDaniel's driver's license and registration. He states: "You were going about 70 miles per hour, paced you in a 55, and you were following the vehicle in front of you too closely." Mr. McDaniel's response cannot be heard on the Video (indeed, due to the noise from the traffic on the highway, even Officer Izquierdo cannot hear him initially, and

- 10 -

asks Mr. McDaniel to "speak up").  Plaintiff testified that he "questioned" Officer Izquierdo's assessment of his speed, McDaniel Dep. at 48, and in the Video, Izquierdo's responses to McDaniel are audible.  Officer Izquierdo states: "You were driving too fast."  And, after another inaudible reply by McDaniel, Izquierdo states: "Sir, you were following the vehicle in front of you too closely, in addition to the speed."  According to Mr. McDaniel, Officer Izquierdo seemed "kind of hesitant," as if "he was trying to figure out what he was pulling me over for." McDaniel Dep. at 48.

By this point (14:26:29 in the Video), Officer Arnold has come to the driver's window, where Izquierdo is standing.  The remainder of the conversation is largely inaudible in the Video. However, Mr. McDaniel and Officer Arnold testified that Mr. McDaniel took his Pennsylvania driver's license from his wallet, gave the license to Officer Izquierdo, and then kept his wallet either in his hands or on his lap.  *See* McDaniel Dep. at 51-57; Arnold Dep. at 22.  The wallet was open in such a way that the Officers could see other contents of the wallet.  McDaniel Dep. at 57-60; Arnold Dep. at 22.  Officer Arnold noticed Mr. McDaniel's Pennsylvania gun permit in the wallet and asked McDaniel what it was.  McDaniel Dep. at 60; Arnold Dep. at 24; *see also* Izquierdo Dep. at 17.  Mr. McDaniel responded: "'It's my Pennsylvania gun permit.'"  McDaniel Dep. at 60; *see also* Arnold Dep. at 24 ("He says it's his permit to carry a handgun.").

There is a factual dispute as to the precise sequence of ensuing events; the relevant portion of the Video is inaudible and so it cannot resolve the dispute.  According to Officer Arnold, he then asked Mr. McDaniel whether he was carrying his handgun at that time, to which McDaniel replied "yes."  Arnold Dep. at 25.  Officer Arnold then asked Mr. McDaniel where the handgun was, and McDaniel told him it was in the trunk.  *Id.*  At that point, according to Officer Arnold, he directed Mr. McDaniel to step out of the vehicle.  *Id.*

- 11 -

In contrast, Mr. McDaniel recalled (although he was not "100% sure") that, after he identified his Pennsylvania handgun permit, Officer Arnold simply asked him to hand over the permit, which McDaniel did.   McDaniel Dep. at 60-61.   At that point, without further questioning, Officer Arnold directed Mr. McDaniel to get out of the vehicle.   *Id.* at 61. According to Mr. McDaniel, the fact that his handgun was in the vehicle (and in the trunk in particular) was not elicited until a few moments later, after he had already gotten out of his car. As defendants acknowledge, *see* Motion at 4 n.1, I must accept Mr. McDaniel's version of events for present purposes; however, as I will explain, this factual dispute is not material.

In any event, Mr. McDaniel promptly complied with Officer Arnold's directive to exit the vehicle.   On the Video (beginning at 14:27:20), plaintiff steps out of the car and the Officers immediately escort him to the back of his car, facing the trunk, where Officer Arnold holds plaintiff's hands behind him and appears to pat him down.[12]

A brief discussion between the Officers and Mr. McDaniel ensues, but it is inaudible on the Video.   At 14:28:05, Officer Arnold handcuffs Mr. McDaniel behind his back.   A few more inaudible words are exchanged and the officers then escort Mr. McDaniel away from his car to the right edge of the shoulder.   Plaintiff's wallet remains on top of the trunk of his car.

At his deposition, Mr. McDaniel testified that, as Officer Arnold held his hands behind his back and patted him down, Officer Arnold asked him an additional question about his permit. However, Mr. McDaniel did not remember the exact question.   McDaniel Dep. at 65-66, 69-70. He claimed that Officer Arnold then told him, "'We are going to put you in handcuffs for your own—for our and your own protection,'" and proceeded to handcuff him.   *Id.* at 63, 70.   As Officer Arnold was handcuffing Mr. McDaniel, he took McDaniel's wallet and placed it on top

---

[12] Notably, this is the first point in the Video when plaintiff is visible.  He is wearing a gray sweatsuit and a baseball cap that is dark in color.

of the trunk.  *Id.* at 66-68.   According to plaintiff, after Officer Arnold placed McDaniel in handcuffs, he asked McDaniel whether there was a gun in the car, and Mr. McDaniel replied: "'Yes, and it's in the trunk.'"  *Id.* at 70.

At 14:28:41 in the Video, Officer Arnold uses his shoulder radio, although the dialogue between Officer Arnold and the dispatcher cannot be heard.  He then asks additional questions of Mr. McDaniel, most of which are inaudible.  At one point, Officer Arnold can be heard to say, "Well, you have a car with Florida registration."   At his deposition, Mr. McDaniel could not recall the exact questions Officer Arnold asked, although he remembered being asked "about Florida."  McDaniel Dep. at 71.  According to Mr. McDaniel, Officer Arnold "may have asked [him] whether the gun was loaded," to which McDaniel replied, "No, it was not."  *Id.* at 71-72.[13]

At his deposition, Officer Arnold indicated that he did not ask Mr. McDaniel for consent to search his vehicle.  Nor did Mr. McDaniel volunteer consent.  Arnold Dep. at 80.

At 14:29:43 in the Video, Officer Arnold directs plaintiff to stand somewhat closer to the police cruiser.   Officer Izquierdo stands with plaintiff while Officer Arnold approaches plaintiff's automobile.  For a few moments, Officer Arnold stands at the trunk, looking down on top of it (presumably, he was looking at Mr. McDaniel's wallet; as noted, it had been left on top of the trunk).  Officer Arnold then walks around the passenger side of the vehicle, puts an object (perhaps the wallet) on top of the car on the passenger side, and tries to open the front passenger door, but it is locked.  He then walks around to the front of the car and opens the front driver's side door.  Video at 14:30:29.  Officer Arnold leans into the car via the driver's door and appears to search the car's interior, in the vicinity of the driver's seat, for two minutes (interrupted at one

---

[13] At Officer Arnold's deposition, he testified that Mr. McDaniel "told [Officer Arnold] he had a loaded weapon in the trunk."  Arnold Dep. at 71; *see also id.* at 72, 74.  Again, for purposes of the Motion, I must accept Mr. McDaniel's version of events.

point by removing an object from the car, which he showed to Mr. McDaniel and Officer Izquierdo).

At 14:32:14 in the Video, Officer Arnold emerges from the driver's seat area, walks to the rear of the vehicle, and opens the trunk.  However, he does not inspect the trunk's interior.  With the trunk open, he immediately walks back along the driver's side of the automobile, reaches into the driver's side window (apparently to unlock the doors), opens the left rear door, and begins to search the rear passenger compartment of the vehicle.  He also spends several seconds inspecting the left rear door itself.  He walks around to the other side of the car, opens the front passenger-side door, inspects the door itself, and then inspects the front passenger seat areas.  He then opens the rear passenger-side door and does the same.

At 14:35:02 in the Video, Officer Arnold moves to the trunk of Mr. McDaniel's car, which is still open.  He removes several containers and items of luggage from the trunk and searches through them, including a backpack, a large duffel bag, three large plastic shopping bags, several cardboard boxes, and other bags.  This takes several minutes.  At some point during the search of the trunk, Officer Arnold apparently locates Mr. McDaniel's handgun, but the moment the handgun is discovered is not evident in the Video.  Officer Arnold also performs further inspections of the passenger areas and doors of the vehicle.

At his deposition, Officer Arnold was asked why he searched the rest of the car before the trunk, when Mr. McDaniel had told him that the handgun was in the trunk.  Arnold Dep. at 27.  He stated that the sequence of the search was "based off of [his] training," and that because the handgun was "secured in the trunk," for "chain of custody purposes, you leave it there until you get ready . . . to seize it."  *Id.* at 27-28.  When asked what he was searching for in the passenger compartment, Officer Arnold responded, "Anything that is in arm's reach of the

driver." *Id.* at 28.  Officer Arnold acknowledged that the trunk does not qualify as within arm's reach.  *Id.* at 29.  When asked whether he was "looking for just weapons, [or] for contraband" within reach of the driver, he replied:  "At that point, I'm just looking for a gun."  *Id.*

At 14:48:06 in the Video, a third officer who had arrived at the scene also begins to inspect the interior of the trunk.  Officer Arnold joins him a few moments later and actually climbs into the trunk.  At approximately 14:53, Officer Arnold and the third officer begin repacking the items into the trunk; they close the trunk at 14:57:44.

At approximately 14:57, an officer (it is not clear whether it is Officer Arnold or one of the other officers on the scene) inspects Mr. McDaniel's pockets and lifts and inspects his cap.  Mr. McDaniel is then directed into the back seat of the Officers' police vehicle.  Although the Video does not show the interaction between Mr. McDaniel and the Officers in the police car, their discussion is captured fairly clearly on the audio recording.  At 15:02:50, Officer Arnold instructs Officer Izquierdo to advise Mr. McDaniel that he is under arrest, and Officer Izquierdo does so.  At this point (which is after the gun has been recovered by the Officers—indeed, one of the officers outside the vehicle places the weapon on the hood of the police vehicle), Mr. McDaniel can clearly be heard strenuously insisting that the gun was not "loaded" as he understood the term.  *See* Video at 15:03:58.  For several minutes, Mr. McDaniel disputes with the Officers whether his handgun was "loaded."  For instance, plaintiff asserts that, "in Philadelphia, unloaded means not in the chamber."[14]  At 15:15:27 on the Video, the Officers' vehicle pulls into traffic and the Video concludes shortly thereafter.

Officer Izquierdo and Officer Arnold transported Mr. McDaniel to the Baltimore City Intake Facility.  *See* Supplement/Continuation Report.  Mr. McDaniel's car was towed and

---

[14] In his Opposition, Mr. McDaniel continues to insist that his gun was not "loaded" within the meaning of applicable law.

impounded.  *Id.*  Mr. McDaniel was charged with a violation of C.L. § 4-203(a)(1)(ii), which provides that a person may not "wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State."  *See* Statement of Charges.[15]  Officer Arnold submitted the following "Statement of Probable Cause" in support of the charge:

> On 11-07-06[16] at approximately 1526 hours while on duty in full uniform operating a marked police cruiser, I observed a 2000 Dodge bearing Florida registration C851EE traveling Interstate 95 South Bound.  I observed the vehicle travel from lane #2 into lane # 3 in the lane of travel following the vehicle in lane #3 less than two car lengths of distance causing the 2000 Dodge to brake to regain distance between himself and the vehicle in lane #3.  I then activated my emergency equipment lights and siren and initiated a traffic stop at IS 95 S.B @MM603.  Upon approach and contact with the operator who was identified through his valid Pennsylvania drivers license to be Mr. Brian McDaniel [sic].  At the vehicle Mr. McDaniel stated that he had a handgun located in the trunk of his vehicle.  Mr. McDaniel also stated and provided a handgun permit to carry a handgun in the state of Pennsylvania.  I then asked the operator to step out of his car and began a probable cause search of the vehicle.  The search of the vehicle revealed a loaded Glock 9mm handgun serial #GAU082 with a loaded magazine carrying 10 live 9mm rounds located in a shopping bag that was located in the trunk of the vehicle.  I then located a second loaded 9mm magazine containing 8 live 9mm rounds that was located next to the handgun.  I then placed Mr. McDaniel under arrest.  All events occurred [in] Baltimore City Maryland.

Mr. McDaniel was held overnight in the Baltimore City Jail.  *See* McDaniel Dep. at 88-94.  His girlfriend posted bail for him the next day.  *Id.* at 94-96.  He hired a lawyer to defend against the charge, which cost him in the "low thousands" of dollars.  *Id.* at 97-98.  About a year after plaintiff's arrest, the prosecutor *nol prossed* the charge.  *Id.* at 98-100.

Additional facts will be included in the Discussion.

---

[15] The prohibition in C.L. § 4-203(a)(1)(ii) is subject to exceptions, some of which are discussed, *infra*.

[16] As noted, there seems to be no dispute that the incident actually occurred on November 8, 2006.

### Discussion

#### A.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As noted, in resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

#### B.  Traffic and Firearms Laws

To provide context for the discussion that follows, I pause to set forth in more detail the Maryland statutes upon which the Officers based their stop and arrest of Mr. McDaniel, as well

as relevant provisions of the federal Firearms Owners Protection Act, upon which plaintiff relies.

According to the Officers, Mr. McDaniel was stopped for speeding and for following too closely the vehicle in front of him.  Both offenses are misdemeanors.  *See* Transp. § 27-101(a) ("It is a misdemeanor for any person to violate any of the provisions of the Maryland Vehicle Law unless" otherwise specified.).[17]

Speeding is governed by Transp. §§ 21-801 and 21-801.1.  Section 21-801(a) states the general standard that a "person may not drive a vehicle on a highway at a speed that, with regard to the actual and potential dangers existing, is more than that which is reasonable and prudent under the conditions."  Section 21-801.1 establishes particular maximum speed limits based on the type and location of the road including, as relevant here, a maximum limit of "55 miles an hour on divided highways" where other restrictions do not apply.  Transp. § 21-801.1(b)(5); *see also id.* § 21-801.1(a) ("A person may not drive a vehicle on a highway at a speed that exceeds these limits.").

Following too closely is governed by Transp. § 21-310(a), which states: "The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the other vehicle and of the traffic on and the condition of the highway."  There is no precise minimum distance prescribed by the statute, however.  Rather,

---

[17] In general, Maryland law does not authorize a police officer to arrest a motorist for speeding or following too closely, unless additional circumstances are present.  *See generally* Transp. § 26-202 (delineating power of arrest for violations of the Maryland Vehicle Law). Rather, such offenses are ordinarily resolved by the issuance of a citation.  *See* Transp. § 26-201. Nevertheless, an arrest for speeding or following too closely would not offend the Fourth Amendment.  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that Fourth Amendment was not violated by arrest of motorist for seatbelt violation, a misdemeanor punishable only by a fine); *see also Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and . . . while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").

"how closely one automobile should follow another depends upon the circumstances of each case, namely, the speed of such vehicles, the amount of traffic, and the condition of the highway. The driver should act reasonably and prudently, taking these factors into consideration." *Sieland v. Gallo*, 194 Md. 282, 287, 71 A.2d 45, 47 (1950); *see also Brehm v. Lorenz*, 206 Md. 500, 505, 112 A.2d 475, 478 (1955) ("Just how near the driver of an automobile may follow another automobile and still exercise ordinary care depends upon the facts and circumstances of the case. . . . [W]hat precautions the driver of the rear car must take to avoid colliding with a car which stops or slows up in front of him, cannot be formulated in any precise rule.") (internal citations omitted).   Following too closely is "a violation as relatively minimal as traffic infractions can be." *Charity v. State*, 132 Md. App. 598, 620, 753 A.2d 556, 567, *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000).

Ultimately, however, Mr. McDaniel was not charged or cited for either speeding or following too closely.  Rather, he was charged with wearing, carrying, or transporting a handgun in a vehicle, in violation of C.L. § 4-203(a)(1)(ii), which provides that, subject to exceptions, a person may not "wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State."  The exceptions to liability are set forth in C.L. § 4-203(b).  One exception to liability allows "the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued" under Maryland's handgun licensing statutes.  C.L. § 4-203(b)(2).  However, as noted, Mr. McDaniel did not have a Maryland license to wear, carry, or transport a handgun.  Among other exceptions, C.L. § 4-203(b) provides:

(b) This section does not prohibit:

* * *

(3) the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person *if each handgun is unloaded and carried in an enclosed case or an enclosed holster*;

(4) the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources-sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity *if each handgun is unloaded and carried in an enclosed case or an enclosed holster*;

\* \* \*

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases[.]

C.L. § 4-203(b) (emphasis added).[18]  Notably, "unloaded" is not a defined term in the statute.

Plaintiff also relies upon the federal Firearm Owners Protection Act, which was enacted in 1986, long before the incident at issue.  *See* Pub. L. 99-308, 100 Stat. 449 (May 19, 1986), *amended by* Pub. L. 99-360, 100 Stat. 766 (July 8, 1986).  The relevant statutory provision, which has not been amended since 1986, is codified as 18 U.S.C. § 926A.  It provides:

Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm **if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger**

---

[18] In addition to the exceptions set forth above, C.L. § 4-203(b) also exempts from liability certain law enforcement officers, *see* C.L. § 4-203(b)(1); a bona fide gun collector's movement of all or part of a gun collection, under certain circumstances, *see* C.L. § 203(b)(5); certain supervisory employees, *see* C.L. § 4-203(b)(7); the carrying of Coast-Guard-approved signal pistols or visual distress signals, *see* C.L. § 4-203(b)(8); and the carrying of a handgun to a law enforcement unit for the purpose of surrendering it by a person carrying a court order requiring its surrender, under certain circumstances, *see* C.L. § 4-203(b)(9).

**compartment of such transporting vehicle**: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.  (Boldface added; italics in original.)

"Section 926A, both textually and in the words of its sponsor, 'confers upon all law-abiding citizens a right to transport their firearms in a safe manner in interstate commerce.'" *City of Camden v. Beretta U.S.A. Corp.*, 81 F. Supp. 2d 541, 549 (D.N.J. 2000) (quoting 131 Cong. Rec. S9101-05 (July 9, 1985) (statement of Sen. Orrin Hatch)).   The regulations implementing the Firearm Owners Protection Act reiterate verbatim the text of § 926A, *see* 27 C.F.R. § 478.38, but neither the statute nor the regulations contain a definition of "unloaded." *See* 18 U.S.C. § 921 (statutory definitions); 27 C.F.R. § 478.11 (regulatory definitions).

Plaintiff has consistently argued, from the time of the traffic stop through the filing of his Opposition, that the handgun in his trunk was "unloaded."  He acknowledges that there was a magazine of ammunition seated in the handgun.  However, because there was not a "round actually loaded into the chamber such as to render the gun instantly operable," he contends that the gun was "locked but not loaded."  Opposition at 5 n.6.  In plaintiff's view, he was transporting the weapon in compliance with § 926A.  But, he has not offered any case law, expert testimony, or other supporting authority for his interpretation of the term "unloaded."

As I see it, under either Maryland law or the Firearm Owners Protection Act, it would be difficult to conclude that a weapon in the condition of plaintiff's handgun was "unloaded." Although neither "loaded" nor "unloaded" is defined in either statute, the common-sense, plain meaning of the term "loaded" includes any weapon that has ammunition inside of it, without regard to whether a round is actually in the chamber.  Moreover, the safety concerns animating both statutes seriously undercut plaintiff's strained interpretation.

It is also noteworthy that, although the regulations interpreting the Firearm Owners Protection Act do not define the term "unloaded," federal regulations in several other contexts distinguish between loaded and unloaded weapons.  Under any of these regulations, plaintiff's handgun would be considered loaded.  *See, e.g.*, 32 C.F.R. § 552.103(b)(1) (Army regulation governing carrying of privately-owned firearms on military installation, stating: "Firearms will be unloaded when carried (*i.e.*, projectiles physically separated from the firearms, not just removed from the chamber), except when actually engaged in hunting or shooting."); 36 C.F.R. § 1.4 (National Park Service regulation stating: "*Unloaded*, as applied to weapons and firearms, means that . . . [t]here is no unexpended shell, cartridge, or projectile in any chamber or cylinder of a firearm or in a clip or magazine inserted in or attached to a firearm . . . ."); 49 C.F.R. § 1540.5 (Transportation Security Administration regulation stating: "*Loaded firearm* means a firearm that has a live round of ammunition, or any component thereof, in the chamber or cylinder or in a magazine inserted into the firearm.").

Finally, when plaintiff was arrested by the Officers, he insisted that his firearm was not loaded by Pennsylvania standards because, as plaintiff put it, "in Philadelphia, unloaded means not in the chamber."  Plaintiff's understanding of Pennsylvania law is incorrect.  Unlike Maryland law and the Firearm Owners Protection Act, the Pennsylvania Uniform Firearms Act defines the term "loaded," and Pennsylvania's definition of "loaded," codified in 18 Pa. Cons. Stat. Ann. § 6102, is even broader than the common-sense meaning of the term or the federal regulations quoted above:

> A firearm is loaded if the firing chamber, *the nondetachable magazine* or, in the case of a revolver, any of the chambers of the cylinder contain ammunition capable of being fired.  *In the case of a firearm which utilizes a detachable magazine, the term shall mean a magazine suitable for use in said firearm which magazine contains such ammunition and has been inserted in the firearm or is in the same container or, where the container has multiple compartments, the same*

*compartment thereof as the firearm.*  If the magazine is inserted into a pouch, holder, holster or other protective device that provides for a complete and secure enclosure of the ammunition, then the pouch, holder, holster or other protective device shall be deemed to be a separate compartment.  (Emphasis added.)

Accordingly, I am fully satisfied that plaintiff's handgun was loaded under any applicable definition.   Thus, plaintiff was not in compliance with Maryland or federal law when transporting his weapon.[19]

Nevertheless, resolution of the legal issues presented in this case does not depend on whether plaintiff was actually in compliance with Maryland and federal firearms law.  Rather, as I will explain, it depends on whether a reasonable officer in the Officers' position would have had probable cause to believe that plaintiff was violating the law.  Therefore, determination of whether plaintiff's handgun was actually "unloaded" is, strictly speaking, unnecessary to resolution of the Motion.

## C.  Section 1983 Liability and Qualified Immunity

Count I of the Amended Complaint arises under 42 U.S.C. § 1983, which establishes a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Here, plaintiff principally seeks to vindicate his right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the Constitution.  The Fourth Amendment,

---

[19] Even if the handgun had been unloaded and plaintiff were otherwise in compliance with the exception to liability found in C.L. § 4-203(b)(3), his handgun was in a plastic shopping bag and not in an "enclosed case or an enclosed holster," as required by the Maryland statute.

discussed in detail, *infra*, guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 1983 provides a damages remedy for violations of the Fourth Amendment. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights.").[20]

As noted, plaintiff also relies upon the Firearm Owners Protection Act. It is not clear, however, that the Firearm Owners Protection Act itself creates a right that is directly enforceable under § 1983. *See Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 136-39 (2d Cir. 2010) (holding that 18 U.S.C. § 926A, standing alone, does not create a right that can be enforced under § 1983); *accord Revell v. Port Authority of N.Y. & N.J.*, Civ. No. 06-402 (KSH), 2007 WL 1963017, at *3-7, 2007 U.S. Dist. LEXIS 47351, at *8-19 (D.N.J. June 29, 2007) (same), *aff'd on other grounds*, 598 F.3d 128 (3d Cir. 2010) (assuming, *arguendo*, that § 926A is enforceable under § 1983, but holding that defendant officers did not violate § 926A), *cert. denied*, 131 S. Ct. 995 (2011).[21] Nevertheless, to the extent that a plaintiff sues under § 1983 for a violation of the Fourth Amendment, courts have recognized that a police officer's disregard of the Firearm Owners Protection Act may render a search or seizure constitutionally unreasonable. *See Torraco*, 615 F.3d at 139-40; *see also Revell*, 2007 WL 1963017, at *6-7, 2007 U.S. Dist. LEXIS 47351, at *16-19 (granting leave to amend so as to assert a Fourth Amendment claim under

---

[20] By its text, the Fourth Amendment applies only to the federal government, but in *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949), the Supreme Court held that "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is . . . implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment. Therefore, state officers must comport with the requirements of the Fourth Amendment.

[21] To the extent that the Firearm Owners Protection Act does create a right directly enforceable through § 1983, my conclusion that plaintiff was not actually in compliance with the Firearm Owners Protection Act would be sufficient to dispose of such a claim.

§ 1983, although dismissing § 1983 claim based on § 926A alone, and stating: "Arguably, there is a violation of § 926A if [plaintiff] has complied with § 926A and is nonetheless detained by the police and/or arrested, and/or if the firearms are seized.  But the § 926A violation is a subsection of the main event: seizures that are arguably 'unreasonable' have occurred, and this necessarily directs a Fourth Amendment analysis . . . .").

The defendants maintain that they did not violate the plaintiff's Fourth Amendment rights and, in any event, that they are protected by qualified immunity.  With respect to claims under § 1983, courts have recognized qualified immunity as an affirmative defense.

"The doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).  Put another way, qualified immunity shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Thus, "officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful" will be entitled to immunity from suit. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.) (en banc), *cert. denied*, 132 S. Ct. 781 (2011); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).  "The qualified immunity standard 'gives ample room for mistaken judgments' by

protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (citation omitted). Because qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. "Although officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions." *Henry*, 652 F.3d at 535.

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (citation omitted). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *see also Merchant*, 677 F.3d at 662 (stating that the "two inquiries . . . may be assessed in either sequence").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (citation and some internal quotation

marks omitted).   "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'   In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   *Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks and citations omitted).   "If the law at th[e] time [of the alleged violation] was not clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."   *Harlow*, 457 U.S. at 818.   On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."   *Id.* at 818-19.

In assessing whether a right was clearly established, the Fourth Circuit has stated that "'courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'"   *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (citation omitted).   Nevertheless, "[f]ederal laws . . . do not need judicial approval to take effect and be clearly established."   *Lovelace v. Lee*, 472 F.3d 174, 197 (4th Cir. 2006).   Thus, judicial precedent is not always necessary to clearly establish a statutory right, especially where the statute's "core protections" are plain from its text. *Id.* at 198 (holding that prison guard was not entitled to qualified immunity for violation of the Religious Land Use and Institutionalized Persons Act, despite the fact that the statute had been enacted only two years before the violation and the constitutionality of the statute had been

subject to debate).  Moreover, "'[i]f [state] officials choose to ignore a federal law, they do so at their own peril.'"  *Id.* at 197 (quoting *Schwenk v. Hartford*, 204 F.3d 1187, 1204 (9th Cir. 2000)).

### D.  Fourth Amendment

By its plain text, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980).  The "test of reasonableness under the Fourth Amendment is an objective one."  *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  What the Supreme Court said in *Rodriguez*, 497 U.S. at 185-86, is salient:

> [I]n order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

The sequence of events at issue in this case involves several discrete steps as to which different strands of Fourth Amendment jurisprudence are relevant.  The first issue is whether the Officers' initial traffic stop of plaintiff's vehicle was reasonable under the Fourth Amendment.

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  *Whren*, 517 U.S. at 810.  "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as

long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009).

In *Whren*, the Supreme Court held that a traffic stop is not "rendered invalid by the fact that it was 'a mere pretext for a narcotics search,'" so long as the officer conducting the stop had probable cause to believe that the motorist had violated the traffic code. *Whren*, 517 U.S. at 813 (citation omitted). This is because Fourth Amendment reasonableness is an objective determination, which does not "depend[ ] on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*[22]

Although an officer's subjective motivation for initiating a traffic stop is irrelevant to Fourth Amendment analysis, in order to effect a lawful stop of a vehicle, an officer must have either probable cause or, at the very least, a reasonable, articulable suspicion to believe that the motorist is violating the law.[23] Conversely, a traffic stop violates the Fourth Amendment when

---

[22] To be sure, the *Whren* Court observed that pretextual bases for traffic stops could violate the Constitution in some circumstances. The Court said: "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813. But, the Court explained, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause [of the Fourteenth Amendment], not the Fourth Amendment." *Id.* In this case, although plaintiff has asserted that the Officers initiated the traffic stop based in part on the fact that he is African-American, he has not asserted an equal protection claim. Rather, his federal constitutional challenge is limited to whether he was subjected to an unreasonable search and seizure. Although plaintiff's claim implicates the Fourteenth Amendment, the provision of the Fourteenth Amendment that is implicated is the Due Process Clause, which incorporates the Fourth Amendment as to the states, and not the Equal Protection Clause. Because plaintiff has not asserted an equal protection claim, I need not consider whether the facts alleged would support such a cause of action.

[23] The "reasonable suspicion" standard derives from *Terry v. Ohio*, 392 U.S. 1 (1968). There, the Supreme Court held that a police officer may briefly detain a person "for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," *id.* at 22, so long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The reasonable suspicion standard requires the police to possess "a 'particularized and

there is no "reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law." *Prouse*, 440 U.S. at 650. In other words, under *Whren*, an officer who observes a suspected traffic violation may effect a traffic stop, even if the officer's subjective motivation for the stop is not the traffic violation itself, but the hope that the stop will lead to the discovery of evidence of some other crime. But, this does not mean that an officer may initiate a stop without actually having observed a suspected violation. Moreover, it is safe to say that, for purposes of qualified immunity, all of the foregoing principles have been clearly established at least since *Whren* was decided in 1996.

In this case, plaintiff maintains that there is a dispute of material fact as to whether the Officers actually had a reasonable suspicion that he had violated the traffic laws. In this connection, plaintiff relies on the following evidence, taken in the light most favorable to him: (1) according to his testimony, he was driving at or about the speed limit of 55 miles per hour as he passed the officers; (2) the Officers, as they both admitted, did not gauge his speed with radar or lidar; (3) the Video does not conclusively show that plaintiff was speeding; (4) in fact, the Video clearly shows another vehicle passing plaintiff's vehicle at a higher rate of speed; (5) as plaintiff sees it, the Video conclusively shows that he was not following the vehicle in front of him too closely; and (6) Officer Arnold instructed Officer Izquierdo to tell plaintiff "he was doing 70, maybe following too close, whatever [Officer Izquierdo] want[ed] to tell him," which plaintiff construes as an instruction to fabricate a post hoc justification for the stop. According to

---

objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). It is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). On the other hand, the standard requires more than a mere "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27; *accord United States v. Sokolow*, 490 U.S. 1, 7 (1989).

plaintiff, "[i]n light of the video failing to demonstrate any moving violation—including a moving violation that is supposed to be clearly visible on the tape, there exists (at minimum) an inarguable issue of credibility regarding whether Defendants ever objectively believed they possessed a valid reason to stop Plaintiff's vehicle."  Opposition at 4.

In contrast, the Officers claim that "the video demonstrates that just before the Officers deployed their emergency lights . . . the Plaintiff tapped on the brakes suddenly because he was following the vehicle in front of him too closely."  Motion at 6.  As defendants see it, they "reasonably believed they observed Plaintiff speeding and/or following too closely, and this alone is sufficient to justify the initial stop of the car and to detain it for a time adequate to resolve a routine traffic stop, including requesting license and registration checks, and more."  *Id.*

To be sure, even if the record showed conclusively that plaintiff was not committing a traffic violation, this would not necessarily defeat defendants' Motion.  Even if the Officers were mistaken, both the Fourth Amendment's reasonableness standard and the doctrine of qualified immunity allow for reasonable mistakes.  The Officers were not required to be correct; all that was required was an objectively reasonable, articulable suspicion that plaintiff was violating the traffic laws.  *See, e.g.*, *United States v. Mubdi*, 691 F.3d 334, 342 (4th Cir. 2012) ("'[I]f an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable.'") (citation omitted).  Nevertheless, taking the facts in the light most favorable to plaintiff, I cannot conclude that a jury would be compelled to find that the Officers legitimately had a reasonable, articulable suspicion that plaintiff was committing a traffic violation.

In particular, a fact finder viewing the Video might well conclude that no reasonable officer would have believed that plaintiff was actually following the vehicle in front of him too

closely.  At every time in the Video where the gray car in front of plaintiff's vehicle can be seen,

plaintiff is following a safe distance behind it.  Although the gray car was not visible at the

moment that plaintiff applied his brakes, a fact finder could easily conclude that plaintiff had to

apply his brakes because the gray car also braked suddenly, and not because plaintiff was

following it too closely.[24]  As to speeding, a fact finder could not conclude on the basis of the

Video that plaintiff was violating the general prohibition against traveling at a speed in excess of

"that which is reasonable and prudent under the conditions."  Transp. § 21-801(a).  Indeed, it

would be very difficult for a fact finder accurately to estimate plaintiff's speed simply from

watching the Video (Officer Arnold testified that such a visual estimate would not provide an

adequate basis for a traffic stop, *see* Arnold Dep. at 17).[25]  And, as to the prohibition against

exceeding maximum speed limits, *see* Transp. § 21-801.1, the Video does not contain any record

of the speeds of vehicles being observed, the speed at which the police car was traveling, or

plaintiff's speed.  In the absence of more definitive evidence, the Court is left with a dispute over

credibility: plaintiff testified that he was traveling approximately 50-55 miles per hour, *see*

McDaniel Dep. at 29, while Officer Izquierdo informed him during the stop that he had been

---

[24] The Video provides an obvious and likely explanation for why the gray car might have braked suddenly: the second police car sitting in the median at the point where I-895 and I-95 diverge.  The other police vehicle was just ahead of the gray car at the moment when plaintiff applied his brakes.  *See* Video at 14:22:55 – 14:23:23.

[25] Although it had not been decided at the time of the traffic stop in this case, the Fourth Circuit recently held, in *United States v. Sowards*, 690 F.3d 583, 593 (4th Cir. 2012), that, "[i]n the absence of sufficient additional indicia of reliability, an officer's visual approximation that a vehicle is traveling in slight excess of the legal speed limit is a guess that is merely conclusory and which lacks the necessary factual foundation to provide an officer with reasonably trustworthy information to initiate a traffic stop."  *Accord Mubdi*, 691 F.3d at 340-41.

It might be possible for an expert to offer an opinion as to what speed the vehicles were traveling on the basis of information contained in the Video.  For instance, the Video contains time stamps and what appear to be global positioning system (GPS) coordinates for each second of footage.  Perhaps speed could be calculated from this information.  However, neither side has offered any expert testimony or argument on this basis.

traveling at 70 miles per hour.  *See* Video at 14:25:45.[26]  This credibility dispute must be resolved by the fact finder.  Moreover, although Officer Arnold's instruction to Officer Izquierdo about what to tell plaintiff regarding the basis for the stop can certainly be interpreted as innocuous, a fact finder might also conclude it was evidence of fabrication.

Ultimately, however, defendants are not entitled to summary judgment as to Count I, even if the traffic stop was lawfully initiated under the Fourth Amendment, because of what transpired as the stop continued.  As indicated, the Officers recovered plaintiff's handgun from the trunk of his car, after conducting a search of his vehicle, including the trunk, without plaintiff's consent.  Even assuming that the traffic stop was permissible, under the version of facts most favorable to plaintiff, no reasonable officer with knowledge of then-clearly-established law could have believed he was entitled to search the trunk of plaintiff's vehicle based on the facts known to the Officers at the time.

As noted, shortly after plaintiff was pulled over and produced his license and registration, Officer Arnold observed plaintiff's Pennsylvania handgun permit in plain view, and asked him what it was.  Assuming that the stop itself was legitimate, the observation of the handgun permit and Officer Arnold's question about it did not trigger a Fourth Amendment violation.  During a traffic stop, items in a car that are in plain view to an officer located outside the car are not "subject to a reasonable expectation of privacy," and thus an officer's discovery of them entails no search or seizure beyond the seizure constituted by the traffic stop itself.  *New York v. Class*, 475 U.S. 106, 118-19 (1986) (holding that Fourth Amendment was not violated where, during an "undoubtedly justified traffic stop" an officer observed the vehicle's vehicle identification

---

[26] As noted, at his deposition, Officer Izquierdo could not recall the speed at which he paced Mr. McDaniel.  Rather, he could only recall that it was a "high rate of speed," which was "sufficient . . . to be able to initialize a stop."  Izquierdo Dep. at 13.  Officer Arnold also could not recall the speed at which Mr. McDaniel was paced, and testified that it was Izquierdo, rather than he, who had observed the speeding violation.  Arnold Dep. at 17-18.

number (VIN), which "is by law present in one of two locations—either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile"); *see also United States v. Stanfield*, 109 F.3d 976, 988 (4th Cir.) ("[T]here is no legitimate expectation of privacy 'shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'") (quoting *Texas v. Brown*, 460 U.S. 730, 740 (1983)), *cert. denied*, 552 U.S. 857 (1997). Moreover, "the law has become well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation," *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004), and the Supreme Court "has made plain" that an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005)).

There is, as discussed, a dispute of fact as to whether Officer Arnold immediately ordered Mr. McDaniel out of the vehicle after observing his Pennsylvania handgun permit or, instead, whether Officer Arnold first asked plaintiff a handful of other questions about the location of his weapon. The dispute is immaterial, however, because the order to Mr. McDaniel to leave the vehicle was a non-event for Fourth Amendment purposes. "'[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *Ohio v. Robinette*, 519 U.S. 33, 38-39 (1996) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam)).

Once Mr. McDaniel emerged from the vehicle, Officer Arnold patted him down, placed him in handcuffs, asked him some further questions, and then began to search the interior of the vehicle.  In the light most favorable to plaintiff, the facts that Officer Arnold knew at that point were that Mr. McDaniel was driving southbound on Interstate 95 in a car with a Florida registration, that Mr. McDaniel had a Pennsylvania driver's license and a Pennsylvania permit to carry a handgun, and that Mr. McDaniel had told him that the handgun was in the trunk of the vehicle and was not loaded.[27]   After Officer Arnold searched the passenger compartment of the vehicle, he searched the trunk, including various items of luggage contained in the trunk.  Officer Arnold discovered the handgun in the trunk, where Mr. McDaniel had indicated that it was.  Despite Mr. McDaniel's protestations to the contrary, the handgun was loaded, containing a magazine of ammunition.

It is doubtful that the patdown, the placement of plaintiff in handcuffs, or the search of the passenger compartment of his vehicle violated the Fourth Amendment.  But, even if they did, qualified immunity would apply because a reasonable officer would not have understood that to be so in light of what was then the clearly established law.

A so-called "*Terry* frisk" is a protective frisk or pat-down, "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.   Under *Terry*, if an officer conducting an investigatory stop has "reasonable fear for his own or others' safety," *id*. at 30, the officer may conduct a *Terry* frisk: "a reasonable search for weapons for the protection of the police officer, where [the officer] has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id*. at 27.  As the Supreme

---

[27] As noted, plaintiff claims he told the officers the gun was unloaded before the search. He clearly claimed it was unloaded after it was found.

Court has said, a "policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Moreover, the "use of handcuffs [does] not convert [a police] encounter into a custodial arrest [if] the use was reasonably necessary to protect the officer's safety." *United States v. Hamlin*, 319 F.3d 666, 671 (4th Cir. 2003).

As an extension of the *Terry* frisk doctrine, the Supreme Court held in *Michigan v. Long*, 463 U.S. 1032, 1049 (1983), that, in the context of a traffic stop, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."

The Officers knew that Mr. McDaniel had a permit to carry a handgun and they knew, because Mr. McDaniel had told them so, that he was "armed"—he had a handgun in the vehicle. Perhaps it is debatable whether the fact that a suspect is armed means that he is, *ipso facto*, "dangerous" within the meaning of *Terry*. In *Bellotte v. Edwards*, 629 F.3d 415 (4th Cir. 2011), in the context of a "no-knock" search of a home, the Fourth Circuit rejected the claim that officers had "a reasonable suspicion of danger to themselves and to the [homeowners] because both [of the homeowners] had concealed carry permits," and thus "'might have handguns readily accessible to them.'" *Id.* at 423 (quoting officers' brief). The Court stated: "We recognized over a decade ago that '[t]his clearly was not and is not the law, and no reasonable officer could have believed it to be so.'" *Id.* (quoting *Gould v. Davis*, 165 F.3d 265, 272 (4th Cir. 1998)). Nevertheless, in this case, the Officers knew not only that plaintiff had a handgun permit, but

that he was carrying a weapon in the vehicle with him at the time.  In the context of a roadside stop, I cannot conclude that a reasonable police officer, on the basis of clearly established precedent at the time, would not have had an objectively reasonable concern for his safety in that circumstance.  Nor can I conclude that a reasonable officer would have been required to take plaintiff at his word that the weapon was not in the passenger compartment, easily accessible to plaintiff, and that the weapon was unloaded.  A reasonable officer could have believed he was entitled to perform a *Terry* frisk of Mr. McDaniel, to place him in handcuffs, and to perform a protective search of the vehicle's passenger compartment.

However, it was clearly established by the Supreme Court in *Michigan v. Long* that the permissible scope of a protective search does not extend to a search of a vehicle's trunk. Although the Supreme Court found in *Long* that the warrantless search of the car's passenger compartment was valid, it remanded for the lower court to determine whether a subsequent search of the trunk could be justified on some other ground.  *See* 463 U.S. at 1053.  *See also Valance v. Wisel*, 110 F.3d 1269, 1278 (7th Cir. 1997) ("The trunk search cannot be justified under *Michigan v. Long* because Valance would not have been able to gain immediate control of a weapon located there.").

Defendants invoke C.L. § 4-206, a provision of Maryland law that authorizes a police officer to conduct a limited search based upon reasonable suspicion that a person is wearing, carrying, or transporting a handgun in violation of Maryland law.[28]  *See Allen v. State*, 85 Md.

_____

[28] The full text of C.L. § 4-206(a) states:

(a)(1) A law enforcement officer may make an inquiry and conduct a limited search of a person under paragraph (2) of this subsection if the officer, in light of the officer's observations, information, and experience, reasonably believes that:

   (i) the person may be wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle;

App. 657, 671, 584 A.2d 1279, 1285 ("In enacting [earlier codification of C.L. § 4-206], the

Legislature adopted the interpretation given to the Fourth Amendment by the Supreme Court in

*Terry* . . . where the Court enunciated an articulable suspicion exception to the probable cause

requirement of the Fourth Amendment."), *cert. denied*, 323 Md. 1, 590 A.2d 158 (1991).

Defendants' reliance on C.L. § 4-206 is misplaced.  Among other limitations, C.L. § 4-

206 only authorizes an officer to "conduct a search of the person limited to a patting or frisking

of the person's clothing in search of a handgun."  C.L. § 4-206(a)(2)(v).  This goes no further

---

(ii) because the person possesses a handgun, the person is or presently may be dangerous to the officer or to others;

(iii) under the circumstances, it is impracticable to obtain a search warrant; and

(iv) to protect the officer or others, swift measures are necessary to discover whether the person is wearing, carrying, or transporting a handgun.

(2) If the circumstances specified under paragraph (1) of this subsection exist, a law enforcement officer:

(i) may approach the person and announce the officer's status as a law enforcement officer;

(ii) may request the name and address of the person;

(iii) if the person is in a vehicle, may request the person's license to operate the vehicle and the registration of the vehicle;

(iv) may ask any question and request any explanation that may be reasonably calculated to determine whether the person is unlawfully wearing, carrying, or transporting a handgun in violation of § 4-203 of this subtitle; and

(v) if the person does not offer an explanation that dispels the officer's reasonable beliefs described in paragraph (1) of this subsection, may conduct a search of the person limited to a patting or frisking of the person's clothing in search of a handgun.

(3) A law enforcement officer acting under this subsection shall take into account all circumstances of the occasion, including the age, appearance, physical condition, manner, and gender of the person approached.

than the scope of a frisk or protective search under *Terry*, and provides no basis for the Officers' search of plaintiff's trunk.

There are two other doctrines applicable in the circumstances of this case that could have permitted the warrantless search of Mr. McDaniel's vehicle: a search incident to arrest, and a search under the so-called "automobile exception" to the warrant requirement. However, under precedent clearly established at the time of the traffic stop, those doctrines would not have allowed a search of the trunk of Mr. McDaniel's vehicle, unless the officers had probable cause to believe that the trunk contained evidence of a crime. Under the version of events most favorable to Mr. McDaniel, however, the facts known to the Officers at the time did not amount to probable cause.

As noted previously, it would have been unusual, but not constitutionally unreasonable under the Fourth Amendment, for the Officers to have arrested Mr. McDaniel for speeding or following too closely. *See, e.g.*, *Atwater v. City of Lago Vista*, *supra*, 532 U.S. 318, 354 (2001). In November 2006, when the traffic stop occurred, the search of an automobile incident to the driver's arrest was governed by *New York v. Belton*, 453 U.S. 454 (1981), and its progeny. In *Belton*, the Court held that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," and "may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." *Id.* at 460 (footnotes omitted). However, the *Belton* Court expressly stated: "Our holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk." *Id.* at 460 n.4. Thus, even assuming, *arguendo*, that the Officers' seizure of Mr. McDaniel prior to

the search was tantamount to an arrest, clearly established precedent prohibited them from searching his trunk incident to the arrest.[29]

In contrast, the "automobile exception," the contours of which were well established at the time of the traffic stop, permits police to perform a warrantless search of any area of a vehicle in which there is probable cause to believe that evidence of criminal activity may be found, including the trunk and containers in the trunk.  *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam) (reiterating that the "automobile exception does not have a separate exigency requirement," beyond the ready mobility inherent to vehicles); *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999) (holding that "police officers with probable cause to search a car may inspect passengers' belongings," in addition to those of the driver, if probable cause exists to believe that the belongings "are capable of concealing the object of the search"); *California v. Acevedo*, 500 U.S. 565, 573 (1991) (holding that, under the automobile exception, officers may search inside a closed container that is in a vehicle if they have probable cause to search the container, even if they "lack probable cause to search the entire car"); *Carroll v. United States*, 267 U.S. 132 (1925) (origin of the automobile exception).  Under the automobile exception, a search must be "based on facts that

---

[29] In 2009, after the occurrence of the traffic stop at issue, the Supreme Court decided *Arizona v. Gant*, 556 U.S. 332 (2009), which significantly restricted the scope of *Belton*.  Under *Gant*, police now may search the passenger compartment of a vehicle incident to a recent occupant's arrest "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," or "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"  *Gant*, 556 U.S. at 343 (citation omitted).  Because *Gant* was decided after the traffic stop at issue, it obviously was not clearly established at the time of the traffic stop.  Therefore, it is not relevant to the resolution of the Motion.

would justify the issuance of a warrant, even though a warrant has not actually been obtained." *Ross*, 456 U.S. at 809.

Accordingly, it was clearly established at the time of the traffic stop that the Officers could only search plaintiff's trunk if they had probable cause to believe that it contained evidence of a crime.  Probable cause is a "'practical, nontechnical conception'" dealing with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citation omitted).  The standard is "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  However, "'[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be searched or seized."  *Id.* (citation omitted).

"'Probable cause means more than bare suspicion but less than absolute certainty that a search will be fruitful.'"  *United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (citation omitted), *cert. denied*, 535 U.S. 1006 (2002).  It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause."  *Gates*, 462 U.S. at 243 n.13.  Nevertheless, it is "'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'"  *Cartnail v. State*, 359 Md. 272, 294, 753 A.2d 519, 531 (2000) (citation omitted).  Even *Terry*'s reasonable suspicion standard, which is a "less demanding standard than probable cause," *Wardlow*, 528 U.S. at 123, requires more than a mere "inchoate and unparticularized suspicion or 'hunch.'"  *Terry*, 392 U.S. at 27.

"'The possibility of an innocent explanation does not vitiate properly established probable cause.'" *Sennett v. United States*, 667 F.3d 531, 537 (4th Cir. 2012) (citation omitted). "Reasonable law enforcement officers are not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'" *Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir.) (citation omitted), *cert. denied*, 531 U.S. 993 (2000).

On the other hand, in order to arrive at probable cause, "an officer may not disregard readily available exculpatory evidence of which he is aware." *Id.* (citing *Smith v. Reddy*, 101 F.3d 351, 357 (4th Cir. 1996)). Officers cannot make "'hasty, unsubstantiated arrests with impunity'" or "'simply turn a blind eye towards potentially exculpatory evidence.'" *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citations omitted). Moreover, police officers must undertake "an objectively reasonable investigation with respect to th[e] information [known to them] in light of the . . . circumstances they face[ ]." *Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir. 1992). Indeed, an officer is charged "with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances." *Sevigny v. Dicksey*, 846 F.2d 953, 957 n.5 (4th Cir. 1988). *See also United States v. Struckman*, 603 F.3d 731, 746 (9th Cir. 2010) (holding that warrantless arrest was unreasonable where "probable cause could easily have been dissipated by minimal inquiry at the outset"); *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances."); *Jones v. State*, 194 Md. App. 110, 136 & n.12, 3 A.3d 465, 480 & n.12 (holding that there was probable cause for arrest, although officers were not certain that defendant had violated trespassing statute, but stating: "We are not suggesting that, if credible

- 42 -

information is learned by a police officer indicating a suspect's right or permission to be on posted property, the officer can ignore it and still have probable cause to arrest for trespass on posted property."), *cert. denied*, 417 Md. 385, 10 A.3d 200 (2010).

Defendants claim that they had probable cause to search Mr. McDaniel's trunk because they "learned, from Mr. McDaniel, that he was transporting a loaded firearm in the trunk of his car. This is in violation of Maryland law." Motion at 11. At Officer Arnold's deposition, when he was asked, "What was the probable cause in this particular instance that gave you the ability to search the vehicle," Officer Arnold stated: "I observed his carry permit from PA, asked him some questions, and he told me he had a loaded weapon in the trunk." Arnold Dep. at 71. Moreover, Officer Arnold testified that, if Mr. McDaniel had not said that there was a loaded weapon in the trunk, he would not have had probable cause to search the vehicle. Arnold Dep. at 80. Of import here, defendants rely solely on Mr. McDaniel's alleged admission as to a loaded weapon in the trunk to support their claim that they had probable cause to search the trunk.

As indicated, under several circumstances, Maryland law allows a person to transport an unloaded handgun in a vehicle without a license to wear, carry, or transport. *See* page 20, *supra*. These circumstances include carrying an unloaded gun between the person's "bona fide residences," or to and from a target shoot or a hunt. *See* C.L. § 4-203(b)(4)-(6). Similarly, under the Firearm Owners Protection Act, *see* 18 U.S.C. § 926A, a weapon must be unloaded in order to be transported lawfully. Therefore, if the jury agrees with defendants' version of the facts, i.e., that plaintiff admitted before the search that he had a loaded gun in the trunk, defendants would have had probable cause to believe that Mr. McDaniel was transporting a handgun in a vehicle in violation of Maryland law, and outside the protection of the Firearm Owners Protection Act.

But, defendants overlook that, under the version of events most favorable to plaintiff, which I must accept for purposes of the Motion, Mr. McDaniel told them (albeit incorrectly)[30] that he was transporting an <u>un</u>loaded firearm in his trunk.  To be sure, Mr. McDaniel's testimony in this regard was equivocal: he stated that Officer Arnold "may have asked" whether the gun was loaded and that, if so, he had replied that it was not.  McDaniel Dep. at 71-72.  But, in addition to Mr. McDaniel's own testimony, other circumstantial evidence (from which I must resolve the reasonable inferences in plaintiff's favor) casts substantial doubt on the proposition that plaintiff stated his weapon was loaded.

Although Officer Arnold's questioning of plaintiff before the search is inaudible in the Video, the discussion between Mr. McDaniel and the Officers after the search is clearly audible. Following the recovery of the handgun, Mr. McDaniel can be heard strenuously insisting that the weapon was not loaded.  This clearly supports the logical inference that plaintiff did not say, just minutes earlier, that the weapon was loaded.  It is also salient that, in the Statement of Probable Cause, quoted in full, *infra*, which Officer Arnold prepared shortly after the traffic stop, the officer recounted that Mr. McDaniel told him that the firearm was in the trunk, but he did not mention any statement by Mr. McDaniel claiming that the weapon was loaded.  Taking the facts in the light most favorable to plaintiff, I must assume either that Mr. McDaniel explicitly told the Officers that his weapon was unloaded before the trunk search was conducted, or (at best for defendants) that the Officers simply did not ask Mr. McDaniel whether the weapon was loaded before searching the trunk.

It is also pertinent that Mr. McDaniel had presented the Officers with a valid Pennsylvania license to carry a firearm.  As indicated, the Firearm Owners Protection Act allows

---

[30] It is not clear whether plaintiff was honestly mistaken as to the definition of "unloaded," or was misrepresenting the facts to the Officers.

an otherwise law abiding person to transport a firearm in a vehicle "from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," so long as the weapon is unloaded and inaccessible from the passenger compartment. 18 U.S.C. § 926A. The Act expressly supersedes state or local law to the extent of any conflict. *Id.*; *see also* 18 U.S.C. § 927 (limiting preemptive effect of provisions of federal gun laws to situations of "direct and positive conflict between such provision and the law of [a] State"). Section 926A was clearly established, having been enacted more than twenty years before the events at issue. Moreover, at the time of the search of the trunk, no gun had been recovered during the search of the vehicle's interior. So, after the search of the passenger compartment of plaintiff's vehicle, the officers knew that there was no weapon "[ ]accessible from the passenger compartment," within the meaning of § 926A. And, the officers apparently did not question plaintiff as to his travels.

As discussed, even without considering the Firearm Owners Protection Act, Maryland law permits the transportation of an unloaded handgun in a vehicle under several circumstances including, *inter alia*, "between bona fide residences of the person." C.L. § 4-203(b)(3). Plaintiff claims here that he was traveling between his residences in Pennsylvania and Maryland. The record does not indicate that, at the scene, the Officers asked plaintiff the origin and destination of his travel.[31]

In their Reply, defendants note that plaintiff was not licensed to carry a handgun in Maryland, and argue that plaintiff does not satisfy the Firearm Owners Protection Act because he "was transporting his firearm from a place where he lawfully possessed it to a place where he did

---

[31] Of course, it is impossible to know for certain how plaintiff would have responded to a question that was never asked. Moreover, at this juncture, plaintiff has not submitted any evidence, other than his own testimony, that his apartment in Maryland and his parents' home in Philadelphia were both his residences. Nevertheless, at this juncture, and in the absence of any contradictory evidence, plaintiff's testimony is sufficient to create a triable issue.

- 45 -

*not* lawfully possess it."  Reply at 5 (emphasis in original).  In so arguing, defendants overlook that it was clearly established in Maryland by statute and case law that Maryland does not prohibit the possession of handguns in one's residence.  *See* C.L. § 4-203(b)(6); *Williams*, *supra*, 417 Md. at 486, 10 A.3d at 1171-72; *Wieland*, *supra*, 101 Md. App. at 29-30, 643 A.2d at 459-60.  Moreover, as I have discussed, the federal statute permits transportation between places where one may lawfully possess a firearm.  18 U.S.C. § 926A.  And, there are several circumstances under which it is lawful in Maryland to transport an unloaded handgun in a motor vehicle.  *See* discussion of C.L. § 4-203(b) on page 20, *supra*.

To be sure, the Officers did not have sufficient information to determine with certainty whether plaintiff was or was not transporting an unloaded handgun, as required by Maryland and federal law.  Nor were the Officers required to take Mr. McDaniel at his word that he was lawfully transporting his firearm.[32]  And, to obtain probable cause, the officers were not required to rule out any possibility of innocent conduct.  Yet, of import here, defendants have not pointed to a single fact that would have led a reasonable officer to question the veracity of the information provided to them by plaintiff.  Nor have they pointed to any other circumstances that might have aroused (or failed to allay) their suspicions.[33]  To the contrary, they have insisted that they searched the trunk only because plaintiff told them the weapon was loaded, and they have maintained, in contradiction to clearly established law, that even if the weapon was unloaded, plaintiff's transportation of it would have been unlawful.

As already discussed, the Officers were justified in conducting a frisk of plaintiff under *Terry* and a protective search of the passenger compartment of the vehicle under *Michigan v.*

---

[32] As indicated, plaintiff's handgun was loaded.

[33] Defendants have not advanced an argument based on the fact that Mr. McDaniel had a Pennsylvania driver's license but was driving a car with Florida registration and plates.

*Long*.  And, the Officers could have asked plaintiff about his itinerary, which might have elicited facts suggesting that his transportation was unlawful.  But, the officers could not search the trunk of plaintiff's vehicle, in the absence of probable cause, simply to verify that plaintiff was not violating the law.  If it were otherwise, officers would have probable cause to search a citizen's vehicle on the basis of an unsupported, subjective belief that the citizen was violating the law, leaving "'law-abiding citizens at the mercy of the officers' whim or caprice.'"  *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) (citation omitted).

This case is significantly unlike cases in which courts have found that officers had probable cause to search or arrest a person transporting a firearm, despite the Firearm Owners Protection Act.  In *Torraco v. Port Authority of New York & New Jersey*, *supra*, 615 F.3d 129, the Second Circuit held that arresting officers had probable cause to arrest plaintiffs for carrying firearms without a license, in violation of New York law, when the plaintiffs "attempted to transport unloaded firearms in checked baggage through various New York airports."  *Id.* at 132-33.  Neither plaintiff had any "license or . . . other documentation of lawful possession" of his firearm.  *Id.* at 140; *see also id.* at 140 n.7.  Each plaintiff asserted that the laws of his state of residence (Ohio in one case and Florida in the other), to which each was attempting to fly, permitted possession of a handgun without a license.  *Id.* at 138.  But, neither had documentation to support his assertion.  Moreover, both of the plaintiffs were coming from New Jersey, where the handgun laws generally required a license for possession of a handgun outside of one's residence, and each plaintiff had begun his journey at a location in New Jersey that was not (or at least was not clearly) his residence (one was coming from a visit to his mother's house, and the other was coming from a hotel).  *Id*. at 133-36, 138, 140.  And, in the case of one plaintiff, the arresting officer "took the extra step of searching the [Bureau of Alcohol, Tobacco, and

Firearms] database to ascertain whether the gun was lawfully possessed, and fail[ed] to see [plaintiff's] name." *Id.* at 140.   Under these circumstances, the Second Circuit held that "a person of reasonable caution would be warranted in believing that New York [firearms law] had been violated and that the requirements of Section 926A were not met." *Id.*  Here, in stark contrast to *Torraco*, plaintiff had produced a valid Pennsylvania permit to carry his handgun.

Similarly, in *Revell v. Port Authority of New York & New Jersey*, *supra*, 598 F.3d 128, the Third Circuit held that an arresting officer had probable cause to believe that the plaintiff was not in compliance with § 926A.   In that case, Revell, a resident of Utah, was traveling between Utah and Pennsylvania, with a stopover in Newark, New Jersey.  *Id.* at 130.   He was detained at the airport in Newark by a Port Authority police officer after attempting to declare his firearm, which was unloaded and in a locked container, as checked baggage.  *Id.* at 131-32.   Revell had a Utah concealed firearm permit, which he showed the officer.   However, when "asked whether he had authority to carry the firearm in Pennsylvania," Revell did not respond.   *Id.* at 131. Moreover, Revell told the officer that, during his stopover in Newark, he had picked up the bag containing the firearm from the airport and had stayed at hotel in Newark.  *Id.*   The *Revell* Court concluded that the officer "would be entitled to infer from Revell's statements that he had access to his firearm and ammunition while at the New Jersey hotel."  *Id.* at 137 n.15.   Accordingly, the court ruled that "Revell was subject to arrest for violating New Jersey's gun laws."  *Id.* at 137.

In both *Revell* and *Torraco*, based on the facts known to the arresting officers, the officers had probable cause to believe that the plaintiffs were not transporting their weapons in compliance with the Firearm Owners Protection Act.   In particular, the plaintiffs in those cases could not produce licenses or other documentation supporting their claims that they were entitled to possess their firearms at the places of the origin or the destination of their journeys.   Here,

plaintiff was in possession of a valid Pennsylvania handgun permit and, unlike the police officers in *Torraco* and *Revell*, the Officers did not ask plaintiff's origin and destination.

In *dicta*, both the *Torraco* and *Revell* courts expressed doubt as to whether § 926A "requires an officer to 'investigate the laws of the jurisdiction from which the traveler was traveling and the laws of the jurisdiction to which the traveler was going' prior to making an arrest." *Revell*, 598 F.3d at 137 n.15 (citation omitted); *see also Torraco*, 615 F.3d at 137 (stating that § 926A should not be read to "'require a local officer, faced with clear evidence of a gun carried in violation under local law, to know the law of all 50 states and their localities to evaluate whether firearms possession in the departure and destination states is lawful'") (quoting district court with approval).  However, this case does not present the difficulties articulated by the *Torraco* and *Revell* courts.  Here, plaintiff provided a valid handgun permit from his alleged state of origin, which on its face dispelled any need to evaluate the law of that state.  And, the Officers should have been aware of the firearms laws of Maryland, the state that plaintiff claims here was his destination.

In sum, the material facts are disputed.  But, under the facts considered in the light most favorable to plaintiff, a reasonable officer would not have had probable cause to believe that plaintiff's trunk contained evidence of a crime.  Accordingly, I conclude that defendants are not entitled to summary judgment with respect to plaintiff's Fourth Amendment claim.

## E.  Civil Conspiracy (Federal Law)

In his Memorandum Opinion, Judge Bennett dismissed plaintiff's state law claims for civil conspiracy because, "[u]nder Maryland law, 'civil conspiracy is not a separate tort, but rather serves to extend liability to co-conspirators once the plaintiff has established some other tortious wrong.'"  ECF 17 at 20 (quoting *Hovatter v. Widdowson*, 2004 WL 2075467, at *10,

2004 U.S. Dist. LEXIS 18646, at *33 (D. Md. Sept. 15, 2004)).  As a result, Judge Bennett did

not "recognize Count X as asserting a separate state law claim of civil conspiracy," although he

recognized that plaintiff could "potentially rely upon [a civil conspiracy] theory to extend

liability to either of the conspiring Defendant Officers under his surviving claims of false

imprisonment and violation of state constitutional rights."  ECF 17 at 20.  To the extent that

plaintiff alleges a civil conspiracy under Maryland law, those allegations are governed by my

discussion of plaintiff's state law claims, *infra*.

However, Judge Bennett permitted plaintiff to proceed with his civil conspiracy claim

under federal law.  He explained, ECF 17 at 21-22:

> [A]n independent cause of action does exist for civil conspiracy to violate
> federal constitutional rights.  "To establish a civil conspiracy under § 1983, [the
> plaintiff] must present evidence that the [defendants] acted jointly in concert and
> that some overt act was done in furtherance of the conspiracy which resulted in
> [his] deprivation of a constitutional right."  *Hinkle v. City of Clarksburg, W. Va.*,
> 81 F.3d 416, 421 (4th Cir. 1996).  Towards this end, there must be a showing that
> the defendants entered into some sort of an agreement, whether positive or tacit,
> to deprive the plaintiff of a constitutional right.  *Id.*; *see also Simmons v. Poe*, 47
> F.3d 1370, 1377 (4th Cir. 1995) (noting that a conspiracy claimant "must show an
> agreement or a 'meeting of the minds' by defendants to violate the claimant's
> constitutional rights").  Courts have held plaintiffs to a relatively stringent
> standard in assessing whether a conspiracy claim has been properly alleged.  *See
> Gooden v. Howard County*, 954 F.2d 960, 969-70 (4th Cir. 1992) ("To avoid
> evisceration of the purposes of qualified immunity, courts have [ ] required that
> plaintiffs alleging unlawful intent in conspiracy claims under . . . § 1983 plead
> specific facts in a nonconclusory fashion to survive a motion to dismiss.").
>
> McDaniel has set forth specific factual allegations showing that the
> Defendant Officers acted in a joint and concerted manner in the underlying
> events.  It is alleged that the Defendant Officers acted without any proper
> objective justification when they pulled over McDaniel's vehicle, placed him
> under arrest, and searched his vehicle.  He claims that the officers even engaged
> in a discussion in which they concocted pretextual justifications for the vehicle
> stop—thus indicating a "meeting of the minds" through an expressed
> communication of a "conspiratorial objective."  *Hinkle*, 81 F.3d at 421.  At
> bottom, the allegations of the complaint, considered together and liberally
> construed, "reasonably lead to the inference that [the defendants] positively or
> tacitly came to a mutual understanding to try to accomplish a common and

unlawful plan." *Hinkle*, 81 F.3d at 421.  McDaniel has therefore stated a claim for civil conspiracy under § 1983.

Judge Bennett ruled on the basis of the pleadings but, as I see it, Judge Bennett's analysis remains fully applicable at the summary judgment stage.  Plaintiff has now advanced evidence that, taken in the light most favorable to him, would establish the alleged facts that Judge Bennett held adequately framed a civil conspiracy claim.  To be sure, the evidence is disputed, and a jury might well find the Officers more credible than plaintiff on this point.  In particular, Officer Arnold's statement to Officer Izquierdo, although it could be interpreted as evincing a meeting of the minds to fabricate a post hoc justification for the traffic stop, could also be interpreted as entirely legitimate instruction by Arnold to Izquierdo as to what the less-experienced officer ought to disclose to a stopped motorist.  Ultimately, this is a credibility determination that must be resolved by the fact finder.  Accordingly, as to Count X, the Motion will be denied.

### F.  State Law Claims

Plaintiff alleges that the Officers violated Article 24 and Article 26 of the Maryland Declaration of Rights and committed the Maryland common law tort of false imprisonment.[34] Articles 24 and 26 are Maryland's state constitutional counterparts to the Due Process Clause and the Fourth Amendment, respectively, and both are ordinarily interpreted *in pari materia* with their federal analogs.  *See, e.g.*, *Doe v. Dept. of Pub. Safety and Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009) (stating that Article 24 "is *in pari materia* with the Due Process Clause of the Fourteenth Amendment"); *Padilla v. State*, 180 Md. App. 210, 226, 949 A.2d 68, 78 (cataloging cases and stating that "the cases are legion in which Maryland Courts have

---

[34] In his Opposition, plaintiff also argues that his claims for battery and negligence should not be dismissed.  *See* Opposition at 9-10 & n.15.  However, Judge Bennett previously dismissed plaintiff's tort claims for battery and negligence.  *See* ECF 17 at 17-19; *see also* ECF 25 at 6-7 (denying plaintiff's motion for reconsideration as to battery and negligence).  Accordingly, plaintiff's battery and negligence claims are no longer viable, and I will not revisit Judge Bennett's well reasoned rulings.

construed Article 26 *in pari materia* with the Fourth Amendment to the United States Constitution"), *cert. denied*, 405 Md. 507, 954 A.2d 468 (2008).   Neither side argues for a different substantive analysis under the Declaration of Rights than under federal law.

To prevail in asserting the tort of false imprisonment, a "plaintiff must establish that 'the defendant deprived him or her of his or her liberty without consent and without legal justification.'"   *Okwa v. Harper*, 360 Md. 161, 190, 757 A.2d 118, 133 (2000) (quoting *Scott v. Jenkins*, 345 Md. 21, 29, 690 A.2d 1000, 1003 (1997)).[35]   A detention for purposes of conducting a search can constitute a deprivation of liberty for purposes of the false imprisonment tort.   *See, e.g.*, *Ashton v. Brown*, 339 Md. 70, 117, 660 A.2d 447, 470 (1995) (stating that, where "a police officer performed a warrantless search of the plaintiff, over the plaintiff's objection," plaintiff stated a claim for false imprisonment) (citing *Mason v. Wrightson*, 205 Md. 481, 487, 109 A.2d 128, 130 (1954)).   Depending upon context, the "legal justification" for a police officer's deprivation of the plaintiff's liberty might or might not depend upon whether the officer had probable cause to believe a crime has been committed.   The Maryland Court of Appeals discussed the relationship between "probable cause" and "legal justification" in *Ashton*, 339 Md. at 120, 660 A.2d at 472:

> [W]hile the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause.   To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest.

Although probable cause and legal justification are analytically distinct, the Officers' purported probable cause to believe that plaintiff carried or knowingly a transported a handgun in

---

[35] The tort of false imprisonment is largely identical to the tort of false arrest.   *See, e.g.*, *Okwa*, 360 Md. at 189-90, 757 A.2d at 133 ("Although the intentional torts of false arrest and false imprisonment are separate causes of action, they share the same elements.").

his vehicle in violation of C.L. § 4-203(a)(1)(ii) is the only legal justification they have asserted for the search of plaintiff's trunk. *See* Md. Code (2008 Repl. Vol., 2011 Supp.), § 2-202(b) of the Criminal Procedure Article (granting legal authority to "police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer [to] arrest without a warrant any person whom the police officer reasonably believes to have committed the crime"). As discussed above, a reasonable fact finder could conclude that defendants lacked probable cause to search plaintiff's trunk. Therefore, summary judgment for defendants would be inappropriate based on the substance of plaintiff's state law claims.

Nevertheless, defendants contend that they are entitled to statutory immunity from plaintiff's state law claims under the Maryland Tort Claims Act ("MTCA"). The MTCA grants State personnel immunity from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md. Code (2006 Repl. Vol., 2011 Supp.), § 5-522(b) of the Courts & Judicial Proceedings Article ("C.J."). The "MTCA does not distinguish between constitutional torts and common law torts. Accordingly, the same standards of malice and gross negligence govern" state common-law tort claims and violations of state constitutional rights. *Newell v. Runnels*, 407 Md. 578, 640 n.28, 967 A.2d 729, 766 n.28 (2009). Moreover, statutory immunity under the MTCA applies to both negligence and intentional torts. *See Lee v. Cline*, 384 Md. 245, 266, 863 A.2d 297, 310 (2004).[36] For purposes of MTCA immunity, "malice" refers to so-called "actual malice," *i.e.*,

---

[36] Statutory immunity under the MTCA is thus distinct from Maryland's common law doctrine of public official immunity, which "is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee*, 384 Md. at 258, 863 A.2d at 305.

"conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'"  *Id.* at 268, 863 A.3d at 311 (citation omitted).[37]

Defendants argue that plaintiff has advanced no evidence of actual malice or gross negligence, and therefore they are entitled to judgment as to plaintiff's state law claims on the basis of statutory immunity.  Plaintiff maintains that a fact finder could conclude that the Officers acted with malice or gross negligence because, under his version of events, the Officers "intentionally stopped Mr. McDaniel for no valid purpose, fabricated a justification to stop his vehicle, removed him from his vehicle without sufficient justification and, finally, arrested him for a crime that federal law prevented him from having even been able to commit."  Opposition at 11.

The Maryland Court of Appeals has made clear that, when defendant State personnel act within the scope of their employment, MTCA immunity applies unless the defendants exhibited actual malice, *i.e.*, "'heinous conduct, characterized by fraud, ill will, spite, evil motive, conscious wrongdoing, or intent to injure,'" *DiPino*, 354 Md. at 56, 729 A2.d at 374 (citation omitted), or gross negligence, which occurs when the defendants act "'in reckless disregard of the consequences as affecting the life or property of another . . . without the exertion of any effort to avoid them . . . or [are] so utterly indifferent to the rights of others that [they] act[ ] as if

_____

[37] Conversely, the MTCA waives the sovereign immunity of the State for tortious acts or omissions of State personnel within the scope of their public duties and committed without malice or gross negligence, subject to certain limitations.  *See* C.J. § 5-522(a)(4); Md. Code (2009 Repl. Vol., 2011 Supp.), § 12-104(a) of the State Government Article ("S.G.").  Judge Bennett dismissed plaintiff's State law claims against the State and its agencies (the MDOT and the MdTA) because it is undisputed that plaintiff did not comply with the notice requirement that is a prerequisite to maintaining suit against the State or its agencies under the MTCA.  *See* S.G. § 12-106(b)(1); ECF 17 at 6-7.  Compliance with the MTCA's notice requirement is not necessary in a suit against individual State personnel in which it is sufficiently alleged that the defendants acted with malice or gross negligence.  *See Barbre v. Pope*, 402 Md. 157, 181-82, 935 A.2d 699, 714 (2007).  There is no dispute that the Officers are State personnel, *see* S.G. § 12-101(a)(2)(i) (employees of the MdTA are State personnel for MTCA purposes), who were acting within the scope of their employment.

such rights did not exist.'"  *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (citation omitted).  The Maryland Court has held definitively that, for purposes of statutory immunity, actual malice cannot be "inferred solely from the absence of probable cause." *DiPino*, 354 Md. at 55, 729 A.2d at 374.  Although a fact finder could conclude that the Officers lacked probable cause to search plaintiff's trunk, plaintiff's view of the evidence is overstated. Once the Officers discovered the loaded handgun in plaintiff's trunk, they had probable cause to arrest him.  Moreover, as I have explained, assuming the validity of the traffic stop, the Officers' directive to Mr. McDaniel to exit his vehicle was not objectionable.

Nevertheless, although actual malice cannot be inferred from the mere absence of probable cause, standing alone, actual malice "can be inferred from an arrest that was so lacking in probable cause and legal justification as to render [the arresting officer's] stated belief in its existence unreasonable and lacking in credibility," when all of the facts are considered in context.  *Thacker v. City of Hyattsville*, 135 Md. App. 268, 308, 762 A.2d 172, 193-94 (2000), *cert. denied*, 363 Md. 206, 768 A.2d 55 (2001).  For instance, in *Lee*, *supra*, 384 Md. at 269-70, 863 A.2d at 312, the Maryland Court of Appeals held that the plaintiff sufficiently alleged malice where a police officer extended a traffic stop and called for a canine search without justification, yelled at the plaintiff, and described the plaintiff to a dispatcher, without justification, as an "uncooperative suspect."

Here, as I have discussed, there are disputes of fact as to whether the Officers' basis for the initial stop was fabricated.  If the Officers were not merely mistaken in their probable cause assessment, but intentionally conspired to fabricate a basis for the traffic stop, they would not be entitled to statutory immunity.  Whether the Officers are entitled to statutory immunity depends on disputes of material fact that must be resolved by the jury.

- 55 -

For the foregoing reasons, the Motion will be denied.  An appropriate Order follows.


Date:   August 21, 2012                                    _____/s/_____

                                                          Ellen Lipton Hollander
                                                          United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRIAN McDANIEL,

    *Plaintiff*,

    v.                          Civil Action No. ELH-10-189

OFFICER ARNOLD and
OFFICER C. IZQUIERDO,

    *Defendants*.

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is, this 21st day of

August, 2012, by the United States District Court for the District of Maryland, ORDERED:

1. Defendants' Motion for Summary Judgment (ECF 44) is DENIED; and

2. The Clerk is directed to correct the docket to reflect the proper spelling of the last name
   of defendant Officer C. Izquierdo (not "Izquiedro").


                              _____/s/_____
                               Ellen Lipton Hollander
                               United States District Judge